# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No. 00-3418, 01-1144

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the Northern |
| v. | * | District of Iowa |
| | * | |
| Samuel Alcantar, | * | |
| Elias Real-Flores. | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: September 11, 2001

Filed: November 14, 2001 (Corrected 11/15/01)

_____

Before MORRIS S. ARNOLD and BRIGHT, Circuit Judges, and KYLE, District Judge.[1]

KYLE, District Judge.

Samuel Alcantar and Elias Real-Flores appeal their separate convictions for conspiring to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. We affirm.

_____

[1] The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

I

On July 29, 1999, San Bernardino County Deputy Sheriff Robert Sanchez received a tip that Samuel Alcantar and another man were transporting drugs from San Bernardino, California, to Waterloo, Iowa, in a silver and blue Chevrolet pickup, with Iowa license plate number 722 GLE. The informant further stated that the men were "leaving now" for Iowa.

Deputy Sanchez relayed the information to the California Highway Interdiction Narcotics Enforcement Team (HINET) and to the Tri-County Drug Task Force in Waterloo. This information was further passed on to Officers Ken Weeks and David Neal, Jr., California police officers assigned to a HINET unit in Barstow, California.[2] Officers Weeks and Neal were instructed to watch for the truck and "make a case" against the driver if he violated any traffic laws. Officers Weeks and Neal positioned their car on eastbound U.S. Interstate 15 outside of Barstow, to begin their shift.

At approximately 2:26 p.m., the officers observed the truck following another car too closely and pulled it over. Officer Weeks approached the driver, who was identified by producing a driver's license as Elias Real-Flores. Real-Flores was directed to get out of the truck. The officers then ran a check on his driver's license, which indicated that the license was expired.

Officer Weeks told Real-Flores that he smelled of beer and asked him if he had been drinking. Real-Flores admitted to having had a few beers before leaving home that morning. Officer Neal then conducted a set of field sobriety tests, which Real-Flores passed. Officer Weeks asked Real-Flores where he was going and Real-Flores stated that they were going to Iowa to find work.

---

[2]Barstow is just off U.S. Interstate 15, a major freeway leading from San Bernardino towards Nevada and Arizona.

Officer Weeks then approached the passenger of the truck, who identified himself as Samuel Alcantar. Officer Weeks asked Alcantar where they were going. Alcantar stated that they were going to Iowa to find work. Officer Weeks asked if Alcantar had been drinking and inquired as to why there was no luggage in the truck. Alcantar stated that he had had a beer before leaving that morning. He further stated that he had clothes in both California and Iowa and that Real-Flores would buy new clothes when he found a job.

Less than 20 minutes after initiating the stop, Officer Weeks warned Real-Flores to drive more carefully, wished them good luck in Iowa, and told them they could leave. As Real-Flores walked back to the truck, Officer Weeks asked him if there were any drugs, cocaine, methamphetamine, marijuana, beer, or weapons in the truck. Real-Flores stated "no" to each question. Officer Weeks then asked for permission to search the truck. Real-Flores gave his permission by answering "yes." Real-Flores was then led back to the patrol car. Officer Weeks then asked Alcantar if there were any drugs, weapons, or beer in the truck. Alcantar stated that there were not. Officer Weeks then asked for permission to search the truck. Alcantar gave his permission by answering "yes." Alcantar was then led back to the patrol car.

At about 2:50 p.m. Officer Weeks told Real-Flores and Alcantar that the search would not take very long. At this time Officer Weeks turned on an audio tape recording device in the patrol car.[3] The tape recorded the conversations of Real-Flores and Alcantar occurring in the car for one hour; neither was aware of the recording.

---

[3]At the direction of this Court, a transcript of this audiotape with approximate time references was submitted by both Alcantar and Real-Flores after oral argument. The Court grants Defendants' motions to supplement the record in this fashion.

A very extensive search of the truck was then commenced. At about 2:56 p.m. a narcotics sniffing dog was used to search the car and did not respond positively to the presence of drugs. In total, the search lasted approximately two hours and forty-five minutes. During this time the officers removed and inspected pieces of the truck, used a fiber optic scope to search the gas tank, air conditioning vents, fenders and other hidden areas of the truck, climbed under the truck with a flashlight, pulled apart door and interior fabric panels, and used a stethoscope. No evidence of drugs was found during the search. At approximately 5:27 p.m., the truck was returned to its original condition and Real-Flores and Alcantar were allowed to continue on their trip.

Officer Weeks then arranged for Deputy Sanchez to review the tape and provide a transcript. The next day Deputy Sanchez obtained the tape. Deputy Sanchez, who is fluent in both Spanish and English, reviewed the tape and determined that Real-Flores and Alcantar were talking about drugs in the truck. He also noted that they were "praying" that the officers not find the drugs, and that they were fabricating a story to tell the officers if the drugs were found. After returning to his office, he had a transcript made of the conversation.

Deputy Sanchez then phoned Detective Geisinger in Waterloo, Iowa, and relayed the conversations on the tape. Detective Geisinger established surveillance at the Ravenwood Apartments complex, the residence of the owner of the truck. Around noon on July 31, 1999, the truck was seen at the Ravenwood Apartments. Shortly thereafter, the truck left the apartment complex and was pulled over some two blocks away.

A search warrant was then obtained for the truck based on the information relayed to Detective Geisinger by Deputy Sanchez. The warrant was read to the occupants of the truck and a search ensued. During the search, three pounds of methamphetamine were found in the fan housing unit under the air conditioning fan motor. The drugs were contained in three one-pound packages, all wrapped in plastic

4

and smeared with grease and pepper. Real-Flores and Alcantar were then arrested and charged with possession with intent to distribute methamphetamine.

While awaiting trial, both Defendants were held at the Linn County Jail. During their detention, both Defendants had conversations with Steven Freeman, another inmate at the facility, in which they described why they were in jail and admitted to transporting methamphetamine.

At trial the methamphetamine and the taped conversation from Officer Weeks's patrol car were admitted over the Defendants' objections. In addition, Freeman testified at Alcantar's trial about what Alcantar had communicated to him while at the Linn County Jail.

## II

Both Defendants argue that the district court[4] erred in denying their motions to suppress evidence found during the search of the truck in Waterloo, Iowa.[5] In

---

[4]The Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa.

[5]The Government argues that the Defendants waived their right to appeal the district court's denial of their Motion to Suppress by failing to object to the introduction of the tape and transcript of the conversation. The record, however, clearly indicates that Alcantar objected to the introduction of the tape at trial (Alcantar Trial Transcript at 42-43) and, that Real-Flores specifically preserved the right to appeal during pre-trial conference in the following colloquy:

> MR SCHEETZ: Now, in regards to the admission of the videotape and the audiotape, I'm sure the Court's aware there were significant suppression motions regarding the admissibility of those. I just want to make sure that my introduction of the video or my lack of objection to the audiotape at this trial would not waive my suppression issues that I raised pretrial.
> THE COURT: No, it doesn't waive any suppression issue and you don't

support of that motion, and here on appeal, the Defendants raise three principal arguments.

A

Defendants first argue that the stop in California was pretextual and, therefore, the stop in Iowa was the fruit of an illegal search. We review the district court's decision for clear error. United States v. Pereira-Munoz, 59 F.3d 788, 790 (8th Cir. 1995).

"It is well established . . . that any traffic violation, no matter how minor, provides a police officer with probable cause to stop the driver of the vehicle." Id. at 791. In deciding whether a stop was pretextual or based on probable cause, the district court applies an "objectively reasonable" standard. United States v. Chatman, 119 F.3d 1335, 1340 (8th Cir. 1997). "So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." Pereira-Munoz, 59 F.3d at 790. The subjective intentions of an officer making the stop are irrelevant for the purpose of determining the validity of the stop. Whren v. United States, 517 U.S. 806 (1996).

The district court expressly found that the officers waited until they had a valid reason to stop the truck before pulling it over. The evidence before the district court established that the Defendants were driving too close to another vehicle -- a violation of a traffic law and a legitimate reason to stop a vehicle. The district court's finding that the stop was not pretextual was not clearly erroneous.

---

need to re-urge them. Now, if you have new ones, they need to be raised, but the ones that have already been raised and ruled upon inthe motion to suppress have been preserved.
(Real-Flores Final Pretrial Conference at 22.)

B

Defendants also contend that the search of their truck was unreasonable in length and scope.[6] Specifically, Alcantar argues that (a) he did not voluntarily consent to the search of the truck and (b) if he did consent, the search exceeded the scope of his consent. Real-Flores contends that although he initially consented to the search, he did not consent to a two hour and forty-five minute search of the truck.

1

We review the district court's determination that Alcantar voluntarily gave consent under the clearly erroneous standard. United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994). "[T]he question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). We have held the following characteristics of persons giving consent to be relevant when determining the voluntariness of their consent: (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals. United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997).

---

[6]Defendants also argue that the stop violated Terry v. Ohio, 392 U.S. 1 (1968). Terry does not apply, however, as the Defendants are not challenging the length of the stop that occurred as a result of the traffic violation, but instead are challenging the longer stop that occurred as a result of the consent to search.

At the time of the search, Alcantar was an adult and able to communicate with the officers even though English is his second language. Alcantar was not visibly intoxicated or otherwise under the influence of drugs or alcohol. Although Alcantar was not advised of his right to refuse consent, that is not in and of itself sufficient to find that consent was not voluntarily given. United States v. Zapata, 180 F.3d 1237, 1242 (8th Cir. 1999). Additionally Alcantar admits to having previous experience with the judicial system. There is no evidence of any threats made by either of the officers. Based on the record before the district court, we conclude that it did not clearly err in ruling that Alcantar voluntarily consented to the search.[7]

2

Both Defendants contend that, even if they initially consented to the search of the truck, they did not consent to a two hour and forty-five minute search. They argue that the officers exceeded the scope of the consent, thereby invalidating the search. Accordingly, they contend that the district court erred in admitting the taped conversation. The Government contends that it is not necessary to find the entire two hour and forty-five minute search reasonable, but only to find the first hour of the search -- the hour in which the conversations between Real-Flores and Alcantar were taped -- to be reasonable because no incriminating evidence was obtained after the taping ended. On this issue, we review the findings of fact for clear error and de novo

---

[7]Even if Alcantar's consent was not voluntarily given, that does not render the search invalid. It is "well settled that consent to a search may be given not only by the owner of the property to be searched but also by 'a third party who possesse[s] common authority over or other sufficient relationship to the premises . . . sought to be inspected.'" United States v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993) (quoting United States v. Matlock, 415 U.S. 164, 171 (1974)). The driver may consent to a full search of the car including interior compartments. Id. This is true even if there is another person present, who also has control over the car, so long as that other person does not object. Id. It is undisputed that Alcantar did not object to the search of the truck and, since Real-Flores admits to consenting to the search, there was no error in finding the search to be valid.

the determination that the Fourth Amendment was not violated.  <u>United States v.</u>
<u>Alverez</u>, 235 F.3d 1086, 1088 (8th Cir. 2000).

The touchstone of the Fourth Amendment is reasonableness.  <u>Katz v. United</u>
<u>States</u>, 389 U.S. 347, 360 (1967).  "The standard for measuring the scope of a
suspect's consent under the Fourth Amendment is that of 'objective' reasonableness --
what would the typical reasonable person have understood by the exchange between
the officer and the suspect?"  <u>Florida v. Jimeno</u>, 500 U.S. 248, 250 (1991).  Since the
only "evidence" obtained during the California search was the taped conversations,
we do not need to evaluate the entire two hour and forty-five minute search.[8]
Therefore the question before us is whether an hour-long search was within the scope
of consent in this case.

When asking for consent to search the truck, Officer Weeks informed both
Real-Flores and Alcantar that they would be looking for drugs and weapons.  At no

---

[8]According to Defendant's (Alcantar) Exhibit A, the tape began running at
approximately 14:50.  At 14:56, Real-Flores comments on seeing the drug dog.
Then at 15:05 the following exchange took place.
　　　Real-Flores: "What's that guy doing (UI) ... It's not visible on the bottom
(UI)?"
　　　Alcantar: "No."
　　　Real-Flores: "The guy is putting his hand in it."
　　　Alcantar: "It's there where that guy is."
　　　Real-Flores: "Underneath?"
　　　Alcantar: "No, on top."
　　　Real-Flores: "Oh yeah on top . . . on top . . ."
　　　. . .
　　　Real-Flores: "You can not see it from there, can you?"
　　　Alcantar: "Who knows!"
　　　Real-Flores: "Look how they (UI) there."
　　　Unknown Male: (Sigh)
　　　Alcantar: "Dear god help us! . . . Son-of-a-bitch!  That guy is being
　　　stubborn . . ."

time during the search did either Defendant object to the length of the search. We have previously held that failing to object to the continuation of a consent search makes the continued search "objectively reasonable." United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994).

Furthermore, when the police receive consent to search for items that can be hidden in different parts of a car, searching those areas is "objectively reasonable." Alverez, 235 F.3d at 1089; see also United States v. Hammons, 152 F.3d 1025, 1027 (8th Cir. 1998) (holding that it was objectively reasonable pursuant to valid consensual search of automobile to search bags in trunk that could contain object of search); Gleason, 25 F.3d at 607 (holding that it was objectively reasonable to search all areas of the truck that could hide a weapon). Although these cases do not address the reasonableness of a search in terms of its temporal length, they do establish that, when an officer receives consent to search for an item that can be easily hidden, the officer may conduct a sufficiently thorough search to find those items.

In this case, Officer Weeks received consent to search for drugs and weapons, both of which can easily be hidden. In light of the fact that neither Defendant objected during the first hour of the search and given the number of places within a truck where such items can be hidden, we conclude that the district court did not err in finding that the search did not exceed the scope of consent.

III

Real-Flores also appeals from the district court's ruling precluding him from learning the identity of the confidential informant. We review the district court's refusal to require disclosure of the identity of a confidential informant for abuse of discretion. United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998).

Real-Flores contends that the informant may have been able to corroborate Real-Flores's contention that he was not part of the conspiracy and may have

10

provided other exculpatory evidence. The district court refused to identify the informant due to concerns for the informant's safety. On appeal, the parties have briefed the issue as though the district court had based its decision on the rule articulated in the "tipster" cases. We begin with the "tipster" cases.

In Roviaro v. United States, the Supreme Court recognized the government's privilege to withhold the identity of a confidential informant. 353 U.S. 53, 59 (1956). The Court declined to adopt a blanket privilege, instead creating a balancing test. Id. at 59-61. A defendant must demonstrate the need for disclosure by establishing that the informant's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." Id. at 60-61.

"It is well established that in 'tipster' cases, where the informant is not a necessary witness to the facts, disclosure of the informant is not required." United States v. Moore, 129 F.3d 989, 992 (8th Cir. 1997) (citing United States v. Sykes, 977 F.2d 1242, 1245-46 (8th Cir. 1992); United States v. Harrington, 951 F.2d 876, 878 (8th Cir. 1991). "In order to override the government's privilege of nondisclosure, defendants must establish beyond mere speculation that the informant's testimony will be material to the determination of the case." United States v. Hollis, 245 F.3d 671, 674 (8th Cir. 2001) (quoting Harrington, 951 F.2d at 877).

The confidential informant in this case did not participate in the crime charged nor did the informant testify at trial against Real-Flores. Furthermore, Real-Flores has done nothing more than speculate that the informant may have exculpatory information. Accordingly, there was no obligation on the part of the government to reveal the informant's identity.

IV

Alcantar also contends that the district court erred in admitting the taped conversation between Alcantar and Real-Flores on the grounds that admitting the tape

violated the holding of <u>Bruton v. United States</u>, 391 U.S. 123 (1968) (holding that admission of co-defendant's confession that implicated defendant at joint trial constituted prejudicial error). We review a district court's decision to admit evidence under the deferential abuse of discretion standard. <u>United States v. Johnson</u>, 28 F.3d 1487, 1498 (8th Cir. 1994).

Contrary to Alcantar's position, <u>Bruton</u> does not apply "where the hearsay statement is otherwise admissible under Rule 801(d)(2)(E)." <u>United States v. Coco</u>, 926 F.2d 759, 761 (8th Cir. 1991). Co-conspirator statements are admissible under Rule 801(d)(2)(E) if the prosecution demonstrates that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the declaration was made during the course of and in furtherance of the conspiracy. <u>United States v. Bell</u>, 573 F.2d 1040, 1043 (8th Cir. 1978). The phrase "in furtherance of the conspiracy" is broadly interpreted. <u>United States v. Johnson</u>, 925 F.2d 1115, 1117 (8th Cir. 1991).

In this case, following the teachings in <u>Bell</u>, 573 F.2d 1040, the district court found the that the statements made in the patrol car were in furtherance of the conspiracy. The district court admitted the tape and a transcript thereof conditionally on the government proving that the statements were made by a co-conspirator and in furtherance of the conspiracy. At the end of trial, the district court held that the government had established that a conspiracy to transport methamphetamine to Iowa did in fact exist. The district court further found that Alcantar and Real-Flores were members of that conspiracy. Finally, the district court found that statements about the location of the methamphetamine and the "story" they were going to "stick to" in court if the methamphetamine was found were in furtherance of the conspiracy. We cannot say that the district court erred in so holding.

V

Alcantar also argues that by introducing evidence that Real-Flores confessed to Steven Freeman, the government violated the <u>Bruton</u> rule against admitting the confessions of non-testifying co-defendants.  391 U.S. 123.  The trial transcript very clearly indicates, however, that Freeman did not testify as to statements made by Real-Flores, but only testified as to what Alcantar had said.  Therefore there is no violation of <u>Bruton</u>.

Accordingly, the judgments of the district court are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.