# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3531

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| David Joseph Mickelson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 16, 2004
Filed: August 11, 2004

_____

Before SMITH, BEAM, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

David Mickelson appeals his conviction and sentence for conspiracy to manufacture methamphetamine and to distribute pseudoephedrine knowing or having reasonable cause to believe it would be used to make methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (c)(2), and 846. A jury convicted Mickelson of these charges, and the district court[1] sentenced him to 121 months' imprisonment, five years supervised release, and a special $100 assessment. We affirm.

_____

[1] The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

## I. *Background*

Mickelson, as manager of a BIG Ten Mart convenience store in Waterloo, Iowa, gained access through a wholesale distributor to large quantities of pseudoephedrine pills that were sold at the store. Mickelson and co-defendant Paul Finn, a BIG Ten Mart employee, sold case quantities of pseudoephedrine to various people including Misty Cook, the father-daughter pair of Chuck and Mindy Hobart, and Mindy Hobart's boyfriend, Brad. Finn typically acted as middleman between Mickelson and the buyers in these transactions. Mickelson and Finn earned approximately $400 per case of pseudoephedrine. Finn received either money or methamphetamine in exchange for his involvement.

Evidence at trial indicated that Mickelson's coworkers and Finn's friends overheard conversations between the two men or observed activities concerning deliveries of pseudoephedrine. Coworker Matthew Chapman overheard Finn and Mickelson discuss that they could acquire cases of pseudoephedrine pills apart from the documented inventory for the store. Chapman also saw Mickelson place a box or case of pseudoephedrine pills, which had just been delivered to the store, into Mickelson's green Jeep Cherokee. Chapman saw another case of pills at Finn's residence. Jimmy Joachim, a friend of Finn's, was present on one occasion when Mickelson delivered a duffle bag containing 172 bottles of pills to Finn. Finn then met with Chuck Hobart. In January 2001, Finn's friend Kevin Boike saw Finn deliver boxes of pseudoephedrine pills to Mindy Hobart on two occasions. He also observed Mickelson deliver a box of pills to Mindy Hobart outside of Finn's residence.

Finn also spoke to various people regarding his and Mickelson's enterprise. Kevin Boike, with whom Finn used methamphetamine, testified that Finn told him that Mickelson would store the pills at Finn's apartment, and Finn would receive $300 per transaction plus additional methamphetamine from Mindy Hobart. Later, Finn told Boike that Mickelson had cut Finn out of the middleman position and was dealing with Mindy Hobart directly. Finn told Boike that fake invoices were created

for the pills. Finn said that Mickelson bought the pills for about $900 and resold the pills for between $1,400 to $1,700 per case. Finn estimated that each case contained about 32,000 pills. BIG Ten Mart employee Cheryl Russell testified that Finn told her that Mickelson sold boxes of pseudoephedrine to Chuck Hobart. Cleo Wilder, who used drugs with Finn, testified that Finn would get a "cut" for pseudoephedrine pills sold by Mickelson. Finn told Joachim that Mickelson gave him pills to deliver to the Hobarts. Finn told him that Mickelson would order the pills and reroute the paperwork through other convenience stores.

During a six-month period in 2001, Finn told Misti Boike (coworker and sister to witness Kevin Boike) and her fiance′, with whom Finn lived, that Mickelson gave him pills to deliver to Chuck Hobart, and he would then bring the money back to Mickelson. Another witness, Misty Cook, met both Finn and Mickelson when she worked at the BIG Ten Mart in 1999. Cook testified that she obtained pseudoephedrine pills from various people and provided them to Scott Reavis, who used them to make methamphetamine. Cook, who sometimes assisted Reavis and received methamphetamine in exchange for her involvement, testified that she approached Finn in the summer of 2000 seeking to buy larger quantities of pseudoephedrine pills. Cook testified that Finn told her to buy pills from Mickelson because Finn knew of another couple buying large quantities of pills from Mickelson and knew Cook would be able to as well. Cook knew that the other individuals buying pills were Mindy Hobart and her boyfriend. Thereafter, Cook purchased case quantities of pills from Mickelson on two occasions, once at a car wash when Reavis was present. Each case cost $1,400. Cook testified that each case contained twenty-four bottles, each containing sixty pills. She turned over all of the pills to Reavis for the purpose of making methamphetamine.

Reavis manufactured methamphetamine at a former welding shop in Waterloo, Iowa. At trial, he testified that he produced about two ounces of methamphetamine from 600 to 1,000 pseudoephedrine pills. Reavis said he produced one to two pounds

of methamphetamine at the shop. Reavis identified several people who had assisted him in cooking or in gathering precursors to make methamphetamine. Reavis testified that Misty Cook was one of his suppliers, and that he once accompanied Cook to the BIG Ten Mart to arrange delivery of a case containing approximately 4,000 pills. The delivery of the case of pills occurred at a nearby car wash. Although Reavis was unable to identify the individual who had provided the pills, he stated that the man was driving a green Jeep Cherokee.

On March 22, 2001, authorities searched the welding shop. Authorities seized numerous items relating to the manufacture of methamphetamine, including equipment and containers used in the manufacturing process. Several kinds of precursors and containers for precursors were seized, including a number of empty pseudoephedrine bottles.

Mickelson and Finn were charged in the one-count indictment filed on May 21, 2002. At the time of his arrest, Mickelson admitted his activities to two different law enforcement officers. Mickelson told Trooper Mike McVey that he had sold cases of pseudoephedrine pills to Mindy and Chuck Hobart and Mindy's boyfriend. Mickelson stated that after they acquired the ammonia, they would purchase from $200 to $1,500 worth of pills at a time. He stated that $1,500 was equivalent to a case of pills, while $200 would purchase twenty bottles of pills. Mickelson stated that he sold five-to-seven full cases of pills to Mindy Hobart. Mickelson said he obtained the pills from a salesman named Steve Devine. Later that same day, Mickelson told Sergeant Reicherts that he paid Devine in cash with no paperwork exchanged. Mickelson admitted that he had sold the equivalent of approximately two cases of pills to Misty Cook. He said he knew that the pills were used to make methamphetamine and that his profit on the pills was about $400 per case. He said that the deliveries occurred at his apartment in Cedar Falls, at the BIG Ten Mart, or at College Square Mall in Cedar Falls. Mickelson also said that Joachim was present once when pills were delivered to Finn in a duffle bag.

Prior to trial, Mickelson moved to sever his and Finn's trials, claiming that Finn could provide exculpatory testimony on his behalf if given a separate trial. In his written motion, Mickelson stated:

> Specifically, Paul Finn would testify that he and Mickelson did not conspire to manufacture methamphetamine in any amount, and Finn would further testify that Mickelson did not have any cause to believe that the distribution of pseudoephedrine to Finn would be used by Finn or any other person to manufacture methamphetamine.

At the motion hearing on January 2, 2003, counsel asserted that Finn would only be willing to testify in a separate trial that "there was no conspiracy or agreement to manufacture methamphetamine." He could not say that Finn would testify that Mickelson would not have known the purpose for which the cases of pseudoephedrine were intended. In response, the government argued that the proposed testimony, even if adequately established, was not exculpatory. The district court denied the motion to sever. Mickelson did not raise his severance issue again during trial.

A jury convicted Mickelson and Finn after a three-day trial. The jury specifically found, in connection with the methamphetamine manufacturing aspect of the offense, that Mickelson was responsible for more than 500 grams of a mixture or substance containing methamphetamine. Mickelson filed no post-trial motions and timely appealed.

## II. *Analysis*

On appeal, Mickelson argues that the district court erred in denying his motion to sever, that his inability to cross-examine Finn violated his Sixth Amendment right of confrontation pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), and that the evidence is insufficient to support his conviction.

## A. *Motion to Sever*

Mickelson first argues that the district court erred in denying his request to sever his trial from Finn's because Finn would have offered exculpatory evidence at Mickelson's trial. Mickelson argues that Finn's testimony would have been "powerful evidence" that he did not conspire with Finn or anyone else. He argues that 1) no other evidence supported the conspiracy charge because Reavis stated he never conspired with Mickelson to make methamphetamine; 2) Misty Cook only assumed Mickelson knew of her plans to make methamphetamine with Reavis; and 3) the Hobarts did not testify at trial.

On appeal, we review whether the district court abused its discretion in denying Mickelson's motion to sever and thus prejudiced Mickelson's right to a fair trial. *United States v. Robaina*, 39 F.3d 858, 861 (8th Cir. 1994).[2] Because defendants who are jointly indicted on similar evidence from the same or related events should normally be tried together, to warrant severance a defendant must show "real prejudice," that is, "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *United States v. Oakie*, 12

---

[2] The government contends that the appropriate standard of review is for plain error because Mickelson did not renew his motion to sever at trial to preserve the issue for appeal. However, instead of adhering to a rigid preservation rule, we examine whether the two main concerns underlying the rule have been satisfied. These concerns are "(1) the appellate court's practical ability to determine whether the appellant knew of the error and consented to it; and (2) the unfairness of reversing the trial court on an issue that it did not have the opportunity to consider." *United States v. Westbrook*, 896 F.2d 330, 337 (8th Cir. 1990). This means that even if Mickelson failed to renew his motion for severance at trial, he may not have waived his objection, so long as he did not consent to the error and so long as the district court had the opportunity to consider his motion with full knowledge of the situation. In this case, no evidence exists that Mickelson consented to the error. In addition, the trial court considered the issue in whole prior to trial, and nothing at trial changed regarding the reason for severance. Therefore, Mickelson did not waive his claim for severance.

F.3d 1436, 1441 (8th Cir. 1993) (citing *United States v. Adkins*, 842 F.2d 210, 211–12 (8th Cir. 1988)). A defendant can demonstrate real prejudice to his right to a fair trial by showing (a) his defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants. *United States v. Washington*, 318 F.3d 845, 858 (8th Cir. 2003); *United States v. Jackson*, 64 F.3d 1213, 1217 (8th Cir. 1995).

Severance is not required merely because evidence that is admissible only against some defendants may be damaging to others, *United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995). Nor is it enough for a defendant to claim, as Mickelson does here, that he needed a separate trial in order to call a co-defendant as a witness. He must show that it is likely his co-defendant actually would have testified and that this testimony would have been exculpatory. *United States v. Delpit*, 94 F.3d 1134, 1143–44 (8th Cir. 1996) (citing *United States v. Anthony*, 565 F.2d 533, 538 (8th Cir. 1977)). The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions. *Id.* (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)).

In *Oakie*, the defendant argued that severance was appropriate because a co-defendant would have testified in his favor in a severed trial. 12 F.3d at 1441. Specifically, the co-defendant would have testified that the defendant–who was charged with assault with a deadly weapon and other gun crimes–did not procure the rifle used in the crimes, did not see the defendant shoot the rifle at the end of a car chase, and did not tell the gunman to shoot at the police officer. However, even with this detailed proposed testimony, we affirmed the district court's denial of severance. We noted that to warrant severance, the defendant had to show that his co-defendant's testimony would be "substantially exculpatory"–that it "would do more than merely tend to contradict a few details of the government's case." *Id.* at 1441 (citing *United States v. DeLuna*, 763 F.2d 897, 920 (8th Cir. 1985)). We determined that, in light of

the other trial evidence and the impeachment evidence available to the government, the proffered testimony of the co-defendant did not meet this standard. *Id.*

Here the proposed testimony is even less detailed than in *Oakie*. Mickelson notes that Finn's attorney stated, "I would agree and concur that if called to testify at Mr. Mickelson's trial, [Finn] would testify there was no conspiracy or agreement of any kind to manufacture methamphetamine." Such testimony is insufficient to be "substantially exculpatory," particularly because it is a legal conclusion without facts to support it. The evidence presented at trial clearly supports the conclusion that Mickelson was deeply involved in a conspiracy to manufacture methamphetamine–he was the supplier of the precursor to make the drug, and he admittedly knew that he was supplying it for the production of the drug. As such, we conclude that Finn's potential testimony consisting of a conclusory statement regarding whether a conspiracy existed is insufficient to warrant severance.

## B. *Bruton Issue*

Mickelson next asserts that his Sixth Amendment Confrontation Clause rights were violated by the admission of Finn's numerous statements to others implicating Mickelson in the conspiracy. Mickelson argues that because Finn did not testify at trial, his inability to cross-examine Finn was prejudicial pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). The government responds that the statements were otherwise admissible as co-conspirator statements and, as such, did not trigger the protections in *Bruton*. In addition, the government argues that if any of the challenged statements were admitted in error, it was harmless error in light of the overwhelming evidence of Mickelson's guilt.

We review this challenge for plain error because Mickelson failed to object to all but one of the challenged statements, and that particular statement was admitted as an admission of a co-conspirator. Reversal for plain error is warranted only if "(1) the court committed an error; (2) the error is clear under current law; and (3) the error

affects [the defendant's] substantial rights." *United States v. Turner*, 104 F.3d 217, 221 (8th Cir. 1997). However, even if there has been plain error affecting the defendant's substantial rights, whether we notice the error is a matter of discretion, and we reverse for plain error only where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 736 (1993); *United States v. Griggs*, 71 F.3d 276, 279 (8th Cir. 1995).

In *Bruton*, the Supreme Court held that the admission of statements from a non-testifying defendant that inculpated a co-defendant violated the latter's Confrontation Clause rights, despite a curative instruction otherwise. *Id.* at 135–36; *United States v. Coleman*, 349 F.3d 1077, 1085 (8th Cir. 2003). However, when the statements are those of a co-conspirator and are admissible under Federal Rule of Evidence 801(d)(2)(E), the Sixth Amendment and *Bruton* are not implicated. *United States v. Alcantar*, 271 F.3d 731, 739 (8th Cir. 2001) (citing *United States v. Coco*, 926 F.2d 759, 761 (8th Cir. 1991)). Therefore, if the statements about which Mickelson complains were statements that satisfy Rule 801(d)(2)(E), *Bruton* and the Sixth Amendment are not implicated.

Co-conspirator statements are admissible under Rule 801(d)(2)(E) if the prosecution demonstrates that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the declaration was made during the course of and in furtherance of the conspiracy. *Alcantar*, 271 F.3d at 739. The phrase "in furtherance of the conspiracy" is broadly interpreted. *Alcantar*, 271 F.3d at 739; *United States v. Johnson*, 925 F.2d 1115, 1117 (8th Cir. 1991). When a statement satisfies the requirements of Rule 801, both the Rules of Evidence and the Confrontation Clause allow the government to introduce the statement through a witness who heard the statement, even if the government cannot show that the co-conspirator is unavailable. *United States v. Reyes*, 362 F.3d 536, 541 (8th Cir. 2004) (citing *United States v. Inadi*, 475 U.S. 387, 400 (1986)). The Confrontation Clause does not give the defendant the right to cross-examine a non-testifying co-

conspirator whose statements are introduced under the co-conspirator hearsay exclusion. *Id.* (citing *White v. Illinois*, 502 U.S. 346, 356 (1992)); *cf. United States v. Kehoe*, 310 F.3d 579, 590–91 (8th Cir. 2002) (holding that the Confrontation Clause did not guarantee the defendant the right to cross-examine a speaker whose statements were imputed to the defendant as adoptive admissions of a party opponent), *cert. denied*, 538 U.S. 1048 (2003).

Mickelson complains that numerous statements violated his rights. They include: 1) coworker Cheryl Russell's testimony that Finn said that Mickelson was selling large amounts of pseudoephedrine; 2) coworker and friend Matthew Chapman's testimony that Finn described the arrangements for pseudoephedrine sales between Finn, Mickelson, and Chuck Hobart; 3) friend and fellow drug user Kevin Boike's testimony that Finn described the arrangement for pseudoephedrine sales, calling himself the middleman, discussing the false invoices, and eventually becoming disgruntled when cut out of the middleman position; 4) one-time roommate Misti Boike's testimony that Finn stated that he was the middleman for pseudoephedrine between Chuck Hobart and Mickelson; 5) friend and fellow drug user Jimmy Joachim's testimony that Finn said that pills were ordered through different stores and the paperwork rerouted; 6) friend and fellow drug user Cleo Wilder's testimony that Finn stated that he received a "cut" for selling pseudoephedrine for Mickelson.

In this case, however, these statements clearly satisfied the elements of Rule 801(d)(2)(E) as admissible statements of a co-conspirator. Mickelson and Finn supplied pseudoephedrine pills to numerous people for the purpose of making methamphetamine. For a good portion of the time, Mickelson used Finn as a contact and middleman with the Hobarts and others to take orders and deliver the product. Finn made these statements while he was a participant in a conspiracy with Mickelson

to sell substantial quantities of pseudoephedrine used to make methamphetamine. We conclude that there was no plain error in this case.

## C. *Sufficiency of the Evidence*

Finally, Mickelson argues that there was insufficient evidence to convict him in a conspiracy to manufacture over 500 grams of methamphetamine or in a conspiracy to distribute pseudoephedrine knowing that it would be used in the manufacture of illegal drugs. Mickelson's argument focuses on whether the evidence was sufficient to prove a conspiracy–he claims there was never an agreement–and on whether the government proved the drug quantity.

"The standard of review of an appeal concerning the sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly." *United States v. Davidson*, 195 F.3d 402, 406 (8th Cir. 1999) (citing *United States v. Burks*, 934 F.2d 148, 151 (8th Cir. 1991)). "In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir. 1992).

### 1. *Existence of a Conspiracy*

Mickelson first argues that the evidence was insufficient to establish the existence of a conspiracy. In order to convict Mickelson of conspiracy to manufacture methamphetamine and to distribute pseudoephedrine, the government had to prove that (1) a conspiracy existed; (2) Mickelson knew of the conspiracy; and (3) Mickelson knowingly became a part of the conspiracy. *Davidson*, 195 F.3d at 406. However, "[o]nce a conspiracy has been established, only slight evidence is needed to link a defendant to the conspiracy." *United States v. Pena*, 67 F.3d 153, 155 (8th Cir. 1995). "Participation by a defendant in a single act may in fact demonstrate membership in a conspiracy if the act itself will justify an inference of knowledge of

the broader conspiracy." *Davidson*, 195 F.3d at 406; *United States v. Tran*, 16 F.3d 897, 904 (8th Cir. 1994).

A defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden. *United States v. Jimenez-Perez*, 238 F.3d 970, 973 (8th Cir. 2001). The government need only show that those involved operated pursuant to a common scheme or had a tacit understanding, rather than a formal agreement. *United States v. Hoelscher*, 914 F.2d 1527, 1534 (8th Cir. 1990). Because the details of a conspiracy often are shrouded in secrecy, circumstantial evidence and inferences from the parties' actions may be used to establish the conspiracy's existence. *United States v. Sparks*, 949 F.2d 1023, 1027 (8th Cir. 1991). Finally, evidence of the parties' association, although not in itself enough to establish a conspiracy, is a relevant factor. *United States v. Ivey*, 915 F.2d 380, 384 (8th Cir. 1990).

The evidence in this case establishes a conspiracy existed between Mickelson, Finn, and others. Mickelson and Finn created a system to distribute pseudoephedrine that Mickelson fraudulently obtained from his employer. Mickelson admittedly knew that the pills were being used by various people to manufacture methamphetamine, and he continued to sell to those people. Mickelson's actions indicated that he and Finn agreed that Mickelson would supply pseudophedrine to the people Finn brought to him.

## 2. *Drug Quantity Calculation*

Mickelson also argues that insufficient evidence exists to support the district court's determination of drug quantity. The jury found that Mickelson was responsible for 500 grams or more of methamphetamine. The district court then determined at sentencing that Mickelson was responsible for more than 1.5 kilograms of methamphetamine. Typically, we review a sentencing court's findings of fact regarding the quantity of drugs attributed to a defendant for clear error. *United States v. Maggard*, 156 F.3d 843, 848 (8th Cir. 1998). However, where a defendant fails to

object to the presentence report, as Mickelson did here, we review for plain error. *United States v. Flores*, 959 F.2d 83, 88 (8th Cir. 1992).

Under the Sentencing Guidelines, the quantity of drugs is an issue for the sentencing judge; the government must prove the quantity of drugs attributed to a defendant by a preponderance of the evidence. *Maggard*, 156 F.3d at 847–48 (citing *United States v. Padilla-Pena*, 129 F.3d 457, 467 (8th Cir. 1997)); *United States v. Candie*, 974 F.2d 61, 64 (8th Cir. 1992). Additionally, the district court is required to make findings of fact and rule on unresolved objections to the presentence investigation report, which the district court did in this matter. *Candie*, 974 F.2d at 64. Finally, a "court may rely solely upon a presentence report for findings relevant to sentencing only if the facts in the presentence report are not disputed by the defendant." *United States v. Hammer*, 3 F.3d 266, 271 (8th Cir. 1993) (internal citations omitted).

When a conspiracy is involved, "[a] defendant convicted of conspiracy is properly held accountable for all reasonably foreseeable acts and omissions of any co-conspirator taken in furtherance of the conspiracy." *United States v. Atkins*, 250 F.3d 1203, 1211–12 (8th Cir. 2001). Therefore, in a drug conspiracy, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme. In order to attribute a quantity of drugs to a defendant, the sentencing court is required to find by a preponderance of the evidence that the activity involving those drugs was in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to him. *Id.* Therefore, the district court correctly considered all of the transactions in which Mickelson was involved or that were reasonably foreseeable to him.

A district court has wide discretion at sentencing as to the kind of information considered or its source. *United States v. Johnson*, 767 F.2d 1259, 1276 (8th Cir.

1985). The court's inquiry upon sentencing is largely unlimited either as to the kind of information it may consider, or the source from which it may come. *Id*. Moreover, the court may consider criminal activity for which the defendant has not been prosecuted and "uncorroborated hearsay, provided the [defendant is] given a chance to rebut or explain it." *Id*. Additionally, the testimony of co-conspirators is sufficient evidence on which the court may base the quantity of drugs used for sentencing. *See United States v. Phillippi*, 911 F.2d 149, 151 n.3 (8th Cir. 1990). Finally, "the sentencing court's assessment of the credibility of witnesses is nearly unreviewable." *United States v. Dierling*, 131 F.3d 722, 736 (8th Cir. 1997).

The district court's determination of drug quantity was not in error. The district court calculated the methamphetamine quantity based on an average amount of pseudoephedrine Mickelson sold and an estimate of the amount of methamphetamine produced. The calculation included quantities to which Cook and Reavis testified, as well as the amount to which Mickelson admitted selling to the Hobarts. The district court did not plainly err by taking all of the evidence into consideration to conclude for sentencing that Mickelson was responsible for 1.5 kilograms or more of methamphetamine.

## III. *Conclusion*

The district court did not abuse its discretion in denying Mickelson's motion to sever his trial from Finn's. Furthermore, Finn's statements, as those made by a co-conspirator, were properly admitted and did not violate *Bruton* and the Sixth Amendment. Finally, sufficient evidence supports Mickelson's conspiracy conviction and drug-quantity calculation. Therefore, we affirm.

_____