# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1585

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff- Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| John Thomas Turpin, also known as | * | |
| John Thomas Goodwin, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: October 22, 2009
Filed: January 29, 2010

_____

Before LOKEN, Chief Judge, HANSEN and MELLOY, Circuit Judges.

_____

LOKEN, Chief Judge.

After John Thomas Turpin testified at trial in support of an insanity defense and to exonerate his brother, Gary Goodwin, a jury convicted Turpin of robbery and firearm offenses and acquitted Goodwin. Turpin appeals, arguing the district court[1] abused its discretion when it denied his motion to sever and refused to instruct the jury that a person found not guilty by reason of insanity may be involuntarily committed. We affirm.

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

# I. Background

While driving Goodwin from northern Minnesota to Minneapolis, Turpin stopped and entered A&E Produce, a rural gun store. When he loaded two shells he brought with him into a shotgun on display in the shop, the proprietor, Arnold Erickson, attempted to wrest the gun from Turpin. Turpin fired shots, wounding Erickson and his wife, and left the store with Erickson in pursuit. Goodwin exited Turpin's car, and the brothers fled into the woods in different directions. Law enforcement arrived and found Turpin in a swamp about one hundred yards from the store. He directed officers to the shotgun and later waived his rights and confessed, explaining it was a robbery "that just went bad" and that Goodwin was not involved.

The brothers were jointly indicted on related charges. Both moved for severance on the ground that a joint trial would prejudice Goodwin by depriving him of Turpin's exculpatory testimony. The magistrate judge[2] denied the motions, in part because neither defendant had shown that Turpin would be willing to testify on Goodwin's behalf at a separate trial. Both defendants then filed renewed motions to sever. In support, Turpin submitted an affidavit by Turpin averring that he would testify to his brother's innocence but wanted to preserve his Fifth Amendment right not to testify at his own trial "so that the Jury can decide without knowing about my criminal record," and an affidavit by counsel proffering Turpin's "potential testimony on behalf of Gary Goodwin."

Magistrate Judge Erickson denied the renewed motions for severance. Both defendants appealed, with Turpin arguing that he had established his willingness to testify on Goodwin's behalf and that a joint trial would compel him to "choose between providing exculpatory testimony for his co-defendant (and brother) or

---

[2]The Honorable Raymond L. Erickson, Chief Magistrate Judge of the United States District Court for the District of Minnesota.

preserving the advantages constitutionally guaranteed him" by the Fifth Amendment. The district court denied the renewed motions on the eve of trial. Focusing on Goodwin's motion, the court held that Turpin's proffered testimony was not "substantially exculpatory" and therefore did not establish the "real prejudice" needed to warrant severance. United States v. Mickelson, 378 F.3d 810, 818 (8th Cir. 2004).

Turpin asserted an insanity defense at trial and testified. A defense expert, forensic psychologist John Cronin, first testified that Turpin suffered from substance abuse, depression, anxiety, and paranoid-type schizophrenia. Dr. Cronin opined that schizophrenia was indicated by Turpin's reports of visual and auditory hallucinations in which Turpin, a Native American, heard voices telling him to kill people. If an individual is suffering from schizophrenia, Dr. Cronin explained, "the individual's view of the world is altered." Expressly waiving his Fifth Amendment right, Turpin then testified that visual and auditory hallucinations led him to believe that stores near Indian reservations are the trading posts that cheated Native Americans during the 19th and early 20th centuries, and that these delusions prompted his actions at A&E Produce. He further testified that Goodwin was not involved in the attempted robbery and was unaware of what Turpin was doing. The jury acquitted Goodwin but found Turpin guilty on all but the conspiracy count in the indictment.

## II. The Severance Issue

Turpin argues that the district court abused its discretion in denying his motion to sever. The issue reaches us in an unusual posture. Typically, the issue on appeal after a joint trial is whether the appellant suffered "real prejudice" because, in a separate trial, "it is likely his co-defendant actually would have testified and that this testimony would have been exculpatory." Mickelson, 378 F.3d at 818; see, e.g., United States v. Crumley, 528 F.3d 1053, 1063-64 (8th Cir. 2008). That was the issue the district court addressed in denying Goodwin's renewed motion to sever. But here, Turpin testified at the joint trial, and Goodwin was acquitted. Goodwin's motion to

-3-

sever is thus moot.  On appeal, Turpin raises a different issue.  He argues the district court abused its discretion because denying his motion to sever created a "constitutional dilemma" by forcing him to choose between preserving his Fifth Amendment right not to testify and testifying to his brother's innocence, which would subject him to cross-examination regarding his extensive criminal history.  Turpin cites no case in which severance was granted, or the denial of severance reversed, for this reason.  The only circuit that to our knowledge has considered this contention rejected it.  See United States v. Doe, 655 F.2d 920, 926-27 (9th Cir. 1981).

The contention is inconsistent with general Fifth Amendment principles.  The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  Although the Fifth Amendment guarantees the defendant's right not to testify at his criminal trial, numerous cases reflect the principle that "the government need not make the exercise of the Fifth Amendment privilege cost free."  McKune v. Lile, 536 U.S. 25, 41-42 (2002) (plurality opinion) (quoting McGautha v. California, 402 U.S. 183, 213 (1971), and citing other cases).  As we said in United States v. McFarlane, 309 F.3d 510, 513 (8th Cir. 2002), "the fact that a criminal defendant faces difficult choices does not necessarily compel the individual's choice so as to implicate the Fifth Amendment."  Accord United States v. Searing, 984 F.2d 960, 964-65 (8th Cir. 1993).  These decisions confirm that Turpin's testimony was not compelled in violation of the Fifth Amendment.

This contention is also without merit because Turpin has failed to demonstrate "an abuse of discretion resulting in clear prejudice."  United States v. Flores, 362 F.3d 1030, 1039 (8th Cir. 2004).  Turpin elected to testify, and this testimony was essential in establishing an insanity defense based on the alleged influence of "visual and auditory hallucinations."  Though the jury ultimately rejected the defense, the testimony demonstrates that Turpin's decision to testify was not based solely on a desire to exonerate his brother.  Thus, denying his motion to sever did not result in clear prejudice.

### III. The Jury Instruction Issue

Turpin argues that the district court abused its discretion when it refused his request to instruct the jury "that a defendant found not guilty by reason of insanity or mental defect is subject to involuntary civil commitment." In Shannon v. United States, 512 U.S. 573 (1994), the Supreme Court held that such an instruction is not required, either by the Insanity Defense Reform Act of 1984, or as a matter of federal criminal practice. Turpin's brief argued that Shannon was implicitly overruled by more recent decisions such as Blakely v. Washington, 542 U.S. 296 (2004). But he conceded at oral argument that we must "follow the [Supreme Court] case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/Amer. Exp., Inc., 490 U.S. 477, 484 (1989). Thus, Shannon continues to be controlling precedent. Accord United States v. Polouizzi, 564 F.3d 142, 160-61 (2d Cir. 2009).

To make clear it was not adopting "an absolute prohibition," the Court in Shannon stated "that an instruction of some form may be necessary under certain limited circumstances," noting as one example the need to correct a misstatement by a witness or prosecutor "that a particular defendant would 'go free' if found [not guilty by reason of insanity]." 512 U.S. at 587. Turpin alternatively argues that such a necessity occurred during his trial.

Prior to trial, the court ordered that Turpin be psychologically evaluated for competency and insanity at a federal detention center. Forensic psychologist Cynthia Low examined Turpin and reported that various tests showed a high likelihood that he was malingering. No doubt anticipating that Dr. Low would testify for the government in rebuttal, defense counsel questioned Dr. Cronin about malingering during his direct examination. Dr. Cronin testified that "people who malinger usually have some sort of financial incentive" or other "secondary gain." During cross-examination, the prosecutor returned Dr. Cronin to the subject of malingering:

Q. You . . . gave the jury a definition of malingering indicating that generally people are malingering . . . to gain a benefit. Is that fair?

A. There usually is some secondary gain.

Q. And you would agree with me that Mr. Turpin has a lot to gain or lose in this case?

A. I'm not sure.

Q. Well, freedom, right?

A. I don't know. . . . I thought he was in a lot of trouble.

Q. Okay. Well, being in a lot of trouble, that's a reason to make things up?

A. Oh, absolutely.

Turpin did not object to this questioning. Indeed, he pursued the line of inquiry on redirect, ultimately asking Dr. Cronin to explain, "What's involved in involuntary commitments?" At the conclusion of Dr. Cronin's testimony, Turpin moved for a mistrial or for a special jury instruction, arguing that the prosecutor's reference to "freedom" could be interpreted "by innuendo" as a possible consequence of an insanity verdict. The district court denied both the mistrial motion and the jury instruction request.

On appeal, Turpin argues that the prosecutor's reference to "freedom" required the corrective instruction referred to in Shannon. We disagree. The prosecutor did not assert or even imply that Turpin would be set free if found not guilty by reason of insanity, the example given in Shannon. The cross examination simply confirmed the common sense notion that Dr. Cronin's definition of malingering -- a desire to obtain "some secondary gain" -- could include a desire "to get out of trouble." No

reasonable juror would infer that successful malingering for this reason would *in fact* get the defendant "out of trouble" by setting him free. Thus, this brief exchange with Dr. Cronin was not objectionable, nor was it prejudicial to Turpin, particularly given Dr. Low's extensive rebuttal testimony regarding her opinion that Turpin's claims of visual and auditory hallucinations were evidence of malingering. Moreover, the exchange gave Turpin an opportunity to question Dr. Cronin on redirect about the nature of involuntary commitments. In these circumstances, the district court did not abuse its substantial discretion in refusing to give the requested instruction. <u>See</u> <u>United States v. Wipf</u>, 397 F.3d 632, 635 (8th Cir. 2005) (standard of review).

The judgment of the district court is affirmed.

_____