**UNITED STATES of America,
Plaintiff,**

**v.**

**Tiran Rodez CASTEEL and Devan
Rodez Casteel, Defendants.**

**No. 1:08–cr–00053.**

United States District Court,
S.D. Iowa,
Western Division.

July 29, 2009.

Clifford D. Wendel, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

Chad Douglas Primmer, Primmer Law, Council Bluffs, IA, James F. Whalen, Joseph D. Herrold, Federal Public Defenders Office, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court are nine motions filed by Tiran Casteel and Devan Casteel (collectively "Defendants") between March 3, 2009 and June 3, 2009:

1) Devan Casteel's Motion to Suppress and Motion to Dismiss Counts Six and Seven, filed March 3, 2009.[1] Clerk's No. 85.

2) Devan Casteel's Motion to Sever, filed March 10, 2009.[2] Clerk's No. 89.

3) Devan Casteel's Supplement to [his] Motion to Suppress, filed April 28, 2009.[3] Clerk's No. 123.

4) Devan Casteel's Motion in Limine, filed April 28, 2009.[4] Clerk's No. 124.

5) Tiran Casteel's Motion to Suppress Identification Testimony, filed May 26, 2009.[5] Clerk's No. 139.

---

[1] The Government filed a response to this motion on March 10, 2009. Clerk's No. 88.

[2] The Government filed a response to this motion on March 13, 2009. Clerk's No. 90.

[3] The Government filed a response to this motion on May 7, 2009. Clerk's No. 125.

[4] The Government filed a response to this motion on May 8, 2009. Clerk's No. 126.

[5] The Government failed to respond to this motion.

6) Tiran Casteel's Motion to Dismiss Counts VI and VII, filed May 26, 2009.[6] Clerk's No. 140.

7) Tiran Casteel's Motion to Sever Counts, filed May 27, 2009.[7] Clerk's No. 141.

8) Tiran Casteel's Motion to Suppress, filed May 27, 2009.[8] Clerk's No. 142.

9) Devan Casteel's Supplement to [his] Motion to Sever (hereinafter "Devan Casteel's Supp. Mot. to Sever"), filed June 3, 2009.[9] Clerk's No. 146.

The Court commenced a hearing on the pending motions on May 29, 2009. Clerk's No. 144. After an extended recess, the hearing concluded on June 17, 2009. Clerk's No. 154. All of these matters are now fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 11, 2008, at approximately 11:00 p.m., two armed men forcibly entered the home of Darlene Eitzen ("Eitzen"), a 76 year-old widow who lived alone and who was sewing at the time. Tr. at 10–11, 35. The intruders immediately ordered her to sit in a chair, and the younger intruder, who was wearing a mask that revealed only his eyes, remained with her for the next hour, while the older, unmasked intruder searched the residence. Id. at 11–14, 61–62. The intruders eventually left after stealing a portion of her rare coin collection, the money in her purse, and her vehicle. Id. at 15. Prior to leaving, though, the intruders cut Eitzen's phone lines and destroyed her cell phone. Id. at 16–17. Eitzen proceeded to wait in her home for "quite awhile" due to her

fright before finally venturing to her neighbor's house, where she called her daughter, Deborah Potter ("Potter"). Id. at 17, 36. The police were then called, and Deputy Sheriff Jake Daly ("Deputy Daly") responded, arriving at approximately 1:30 a.m. on September 12, 2008. Id. at 217–18; Ex. 1.

Later that day, Special Agent Paul White ("Agent White") of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") conducted an undercover sale of two firearms to Tiran Casteel. Id. at 87. Agent White arranged the sale with Tiran Casteel, an individual prohibited from possessing firearms, after responding to Tiran Casteel's solicitation for firearms on Craigslist. Id. Tiran Casteel used the alias Don Hutt during the negotiations and agreed to meet Agent White at America's Best Value Inn between 10:00 and 11:00 a.m. Id. Tiran Casteel arrived at the meeting in a green Bonneville driven by his son Devan Casteel, which surprised Agent White because Tiran Casteel never mentioned Devan Casteel during any of the negotiations. Id. at 89, 95. Agent White then conducted the sale, dealing exclusively with Tiran Casteel. Id. at 90. Devan Casteel did not participate in the sale beyond being present and placing the purchased firearms in the backseat of his Bonneville. Id. After Agent White completed the sale, his support team moved in and arrested both Tiran and Devan Casteel. Id. at 90, 158–59.

ATF Agent Tully Kessler ("Agent Kessler"), a member of the support team, proceeded to photograph and to search the

---

6. The Government failed to respond to this motion.

7. The Government failed to respond to this motion.

8. The Government failed to respond to this motion.

9. Deval Casteel's Supplement to [his] Motion to Sever was actually filed after the Court commenced its hearing on the other pending motions. The Government failed to respond to this motion.

Bonneville incident to the arrest of both Defendants. *Id.* at 159–60. During the search, Agent Tully discovered not only the two firearms involved in the sale, but also coins in a bank bag and a box. *Id.* at 162. Agent Tully found the coins after locating the firearms, but he did not seize the coins at that time because they were not related to his search for firearms, ammunition, and corresponding documentation. However, he, or another ATF agent, did request that the assisting Iowa State Trooper John Hitchcock ("Trooper Hitchcock") check to see if any robberies had recently been reported. *Id.* at 163–64, 277. Trooper Hitchcock informed the ATF agents of the robbery involving Eitzen, and the Bonneville was secured until a search warrant for the coins could be obtained and executed. *Id.*

Following Defendants' arrest, ATF Special Agent Darren Hampton ("Agent Hampton") obtained a search warrant for Tiran Casteel's residence. *Id.* at 368; Ex. E. The search warrant permitted the Government to search Tiran Casteel's residence for evidence of weapons trafficking. Ex. E. The search warrant was executed on September 12, 2008, and Agent Kessler, who assisted in the search, found a map with directions to Eitzen's residence in the office area of the home. Tr. at 165, 295. Special Agent David Dales ("Agent Dales") of the Iowa Division of Criminal Investigation ("DCI") also assisted in the search and obtained a separate state search warrant for the map, as well as for collectible coins found in the gun safe that was located in the garage of the residence. *Id.* at 289–92.

In the meantime, DCI Special Agent Donald Shreffler ("Agent Shreffler") drove to Potter's house to interview Eitzen. *Id.* at 183–84. Prior to arriving that afternoon, Agent Shreffler had been made aware that a number of coins had been taken from Eitzen's residence and that the police believed some of those coins had been found in the possession of Defendants. *Id.* at 183. During the interview, Agent Shreffler showed Eitzen a series of three photographs, one of Timothy Blank ("Blank") and one of each of Defendants, and he asked if she recognized any of the men. *Id.* at 185–86. Eitzen identified the masked intruder as Devan Casteel by the eyes in the photographs. *Id.* at 187. She also identified the older, unmasked intruder as Tiran Casteel. *Id.* On October 9, Eitzen again positively identified Defendants as the intruders during a six panel photographic lineup conducted by the Government. *Id.* at 370–72.

Based mostly on these facts, the Government secured a third superceding indictment against Defendants on February 19, 2009. Clerk's No. 72. Count One of the Indictment charges Tiran Casteel with being a felon in possession of a firearm on or about August 10, 2008. Count Two charges Devan Casteel with the sale or transfer of a firearm to a prohibited person on or about August 10, 2008. Count Three charges Tiran Casteel again with being a felon in possession of a firearm on or about September 12, 2008. Count Four charges both Defendants with carjacking on or about September 11, 2008. Count Five charges both Defendants with using or carrying a firearm in relation to a violent crime, namely carjacking as charged in Count Four, on or about September 11, 2008. Count Six charges both Defendants with interference with commerce by robbery on or about September 11, 2008. Count Seven charges both Defendants with using or carrying a firearm in relation to a violent crime, namely interference with commerce by robbery as charged in Count Six, on or about September 11, 2008. Count Eight charges Tiran Casteel with attempting to obstruct justice from on or about September 15, 2008 to on or about February 19, 2009. Count Nine

charges Tiran Casteel with tampering with a witness by attempting to kill, from on or about September 11, 2008 to on or about February 19, 2009. Defendants now challenge both the charges and the admissibility of the evidence against them.

## II. LAW AND ANALYSIS

Defendants make several overlapping requests in their numerous motions. Defendants both move to dismiss Counts Six and Seven, claiming that the Court lacks jurisdiction because the Government cannot "demonstrate a sufficient effect on interstate commerce to establish a violation of the Hobbs Act." Devan Casteel's Mot. to Suppress & Mot. to Dismiss ¶¶ 14–15; Tiran Casteel's Mot. to Dismiss ¶ 3. Defendants also both move to sever several counts for trial, arguing that the Indictment covers separate and distinct crimes and that a joint trial would undermine any potential for a fair trial. Tiran Casteel's Mot. to Sever Counts; Devan Casteel's Supp. Mot. to Sever. Devan Casteel further requests that his trial be severed from Tiran Casteel's trial because the evidence and charges against Tiran Casteel are more severe and "would likely call for the jury to unfairly speculate concerning the charges against Devan Rodez Casteel." Devan Casteel's Mot. to Sever ¶ 4. Finally, both Defendants move for the suppression of most of the evidence against them, asserting that the Government's searches infringed on their Fourth Amendment rights and that the Government's lineups infringed on their Fifth Amendment due process rights. Devan Casteel's Mot. to Suppress and Mot. to Dismiss ¶¶ 2–4; Tiran Casteel's Mot. to Suppress Identification Testimony. The Court will address each of Defendants' arguments in turn.

*A. Jurisdiction under the Hobbs Act*

■ The Hobbs Act proscribes robberies that "in any way or degree obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in com-

merce." 18 U.S.C. § 1951(a). Commerce includes "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof." *Id.* § 1951(b)(3). "This definition of commerce reaches as broadly as Congress's commerce power." *United States v. Quigley,* 53 F.3d 909, 910 (8th Cir.1995) (citing *United States v. Collins,* 40 F.3d 95, 100 (5th Cir.1994)). Accordingly, "[t]he government need only prove a minimal effect on commerce." *United States v. Williams,* 308 F.3d 833, 838–39 (8th Cir.2002) (citations omitted). "[R]obberies from small commercial establishments qualify as Hobbs Act violations so long as the commercial establishments deal in goods that move through interstate commerce." *United States v. Dobbs,* 449 F.3d 904, 912 (8th Cir.2006). The Government need not even prove that a commercial establishment was actively engaging in interstate commerce at the time of the robbery so long as the Government proves the business "customarily purchased goods in interstate commerce, and that the robberies affected this practice." *United States v. Hatcher,* 323 F.3d 666, 671 (8th Cir.2003).

■ While expansive, the reach of the Commerce Clause and the Hobbs Act is not unbridled because "Congress only has power to regulate conduct that exerts a substantial economic effect on interstate commerce. Congress may not regulate conduct that, standing alone, does not directly affect interstate commerce or have a substantial indirect effect on interstate commerce." *Quigley,* 53 F.3d at 910 (internal citations and quotations omitted). Consequently, courts examine robberies against individuals more stringently for an interstate nexus because "[a]ctions normally have a lesser effect on interstate commerce when directed at individuals rather than [at] businesses." *Id.* (citing *Collins,*

40 F.3d at 99–100). Indeed, under Eighth Circuit precedent:

> Criminal acts directed towards individuals rather than businesses may violate § 1951(a) only if (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce, (2) the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commerce, or (3) the acts cause or are likely to cause the individual victim to deplete the assets of an entity engaged in interstate commerce.

*Id.* (citing *Collins*, 40 F.3d at 100). The Court's first task, therefore, is to determine whether the victim of Defendants' alleged robbery was a business or an individual.

■ The Government implicitly argued at the evidentiary hearing that the coins were stolen from a business dealing in interstate goods. The Government presented evidence that Eitzen's late husband, Flint Eitzen, owned and operated a coin collection business, which Eitzen continued after his death. More specifically, the Government presented evidence that Flint Eitzen operated a coin store, bought and sold coins at trade shows, advertised his business in trade magazines, and was considered an active dealer by other professional numismatists. Tr. at 102–03, 106, 129, 342. The Government also offered evidence that Eitzen participated in her husband's business prior to his death and sold coins after he died. *Id.* at 120, 130–31, 342.

Defendants challenge the Government's implicit claim by arguing that Flint Eitzen was nothing more than an avid coin enthusiast. Defendants presented evidence that the Eitzens did not have a tax identification number, insurance, or even a written inventory. *Id.* at 28–29, 256. Defendants also presented evidence that the Eitzens did not report owning a coin business in their past bankruptcy proceeding. *Id.* at 403; Ex. J. Finally, Defendants point to testimony indicating that the Eitzens' numismatist activities declined with Flint Eitzen's health and ended when Eitzen liquidated most of her coins after a previous robbery of her residence on July 28, 2008. Tr. at 121–23. After considering all the evidence, the Court does not believe the September 11, 2008 robbery involved a business because, even if Flint Eitzen operated a business that Eitzen continued, it ended when Eitzen sold her coins after the first robbery in July 2008. Indeed, the Court heard testimony that the remaining coins were not to be sold; Eitzen intended that her family inherit her remaining collection. *Id.* at 71–72, 123.

Since the victim of the robbery was an individual, the Court must now turn to whether or not the Government can satisfy any prong of the three part jurisdictional test adopted by the Eighth Circuit. The Government explicitly argues that the "robbery affected [Eitzen's] ability to sell the coins in interstate commerce since it deprived her of the ability to do so, which in turn led to her inability to fund purchases if she found other coins she wanted." Pl.'s Resistance to Devan Casteel's Mot. to Suppress and Mot. to Dismiss ¶ 14. According to the Government, Eitzen routinely bought and sold coins in interstate commerce, including the coins that were stolen, and the theft impaired her ability to continue this activity. *Id.* Defendants generally deny these allegations, and the Court concurs with Defendants. As noted above, Eitzen liquidated most of her coin collection prior to the robbery and planned to retain the coins stolen from her. Therefore, the theft did not "deplete the assets of an individual who is directly and customarily engaged in interstate commerce." *Quigley*, 53 F.3d at 910. Accordingly, the Government cannot utilize the

first prong of the test to establish the prerequisite interstate nexus.

The Government also cannot satisfy either of the two remaining prongs of the test. Although the Court is unsure of the exact value of the coins stolen from Eitzen, the Court neither saw nor heard any evidence so as to conclude that the "sum at stake [was] so large that there will be some cumulative effect on interstate commerce." *Id.* Likewise, the Court did not see sufficient evidence to find that the robbery caused Eitzen to "deplete the assets of an entity engaged in interstate commerce." *Id.* Therefore, the Court finds that the Government cannot establish jurisdiction under the Hobbs Act and, thus, DISMISSES both Count Six and the subordinate Count Seven as to both Defendants.

### B. Severance

Defendants move to sever several counts for trial. More specifically, both Defendants request that the Court sever Counts One and Two because they are improperly joined. Specifically, Defendants allege that Counts One and Two involve firearm charges unrelated to the robbery of Eitzen. Tiran Casteel also moves to sever Counts Three, Eight, and Nine, arguing that inclusion of those Counts at trial would undermine his right to a fair trial, even though the Government properly joined the charges in the Indictment. Finally, Devan Casteel moves to sever his trial from Tiran Casteel's trial, claiming that a joint trial would be unfairly and improperly prejudicial and violate his constitutional rights.

### 1. Motion to sever Counts One and Two for trial.

Under the Federal Rules of Criminal Procedure, "[an] indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed.R.Crim.P. 8(a). "Offenses have the 'same or similar character' when they 'refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each overlaps.'" *United States v. Steele,* 550 F.3d 693, 702 (8th Cir.2008) (quoting *United States v. Boyd,* 180 F.3d 967, 981 (8th Cir.1999)). Two offenses may satisfy the "relatively short period of time requirement" even when they occur more than a year apart. *United States v. Lindsey,* 782 F.2d 116, 118 (8th Cir.1986) (holding that joinder of two offenses occurring 17 months apart was proper). Likewise, the evidence supporting two offenses may overlap when the offenses are predicated upon the same underlying felony and arise from the same governmental investigation. *Id.* ("Finally, the evidence as to the two counts [of unlawful possession of firearms by a felon] with which [the defendant] was charged overlap somewhat. The offenses are predicated on the same felony.... Moreover, the record indicates that the offense charged in Count II was developed in the course of federal agents' investigation of the transaction underlying Count I."). The Court construes joinder of offenses liberally because joint trials generally increase the accuracy of jury verdicts while reducing the costs of trial. *United States v. Kirk,* 528 F.3d 1102, 1107 (8th Cir.2008); *United States v. Darden,* 70 F.3d 1507, 1526 (8th Cir.1995).

Defendants argue that Counts One and Two are improperly joined with the other Counts in the Indictment because Counts One and Two involve an alleged firearms transaction that occurred a month before the Eitzen robbery. Tiran Casteel's Br. in Supp. of Mot. to Sever Counts at 2; Devan Casteel's Suppl. Mot. to Sever. The Government failed to respond to this argu-

ment, preferring to focus its arguments on whether the Court should order separate trials for Defendants. Without any evidence or argument by the Government, the Court cannot discern whether the evidence supporting Counts One and Two overlaps with the evidence supporting the remaining charges or whether Counts One and Two stems from a common scheme or plan that culminated in the armed robbery of Eitzen. Therefore, the Court must order Counts One and Two severed for the purposes of trial. Should the Government desire a rejoinder of Counts One and Two, it shall file an appropriate motion by August 3, 2009. Accordingly, Defendants' motions to sever Counts One and Two are GRANTED.

### 2. *Motion to sever Count Three and Counts Eight and Nine for trial.*

■■■ Even if joinder is proper under Federal Rule of Criminal Procedure 8(a), the Court must nonetheless decide whether to sever the charges under Federal Rule of Criminal Procedure 14. *United States v. Ruiz,* 412 F.3d 871, 886 (8th Cir.2005). Rule 14(a) states:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

The mere possibility that prejudice will arise from trying two offenses in the same proceeding is alone insufficient to warrant severance. *Kirk,* 528 F.3d at 1107 ("The danger of prejudice to a defendant is inherent in any proceeding in which the Government tries a single defendant for multiple crimes."). Instead, "separate trials are required only where prejudice caused by a joint trial is severe or compelling." *Id.* "Severe prejudice occurs when a defendant is deprived of an appreciable

chance for an acquittal, a chance that [the defendant] would have had in a severed trial." *Boyd,* 180 F.3d at 982 (quoting *United States v. Koskela,* 86 F.3d 122, 126 (8th Cir.1996)). "Where evidence that a defendant had committed one crime would be probative and thus admissible at the defendant['s] separate trial for another crime, the defendant does not suffer any additional prejudice if the two crimes are tried together." *United States v. Taken Alive,* 513 F.3d 899, 903 (8th Cir.2008) (internal quotations and citations omitted). On the other hand, " 'a high risk of undue prejudice [exists] whenever … joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible.' " *United States v. Aldrich,* 169 F.3d 526, 528 (8th Cir.1999) (quoting *United States v. Daniels,* 770 F.2d 1111, 1116 (D.C.Cir.1985)). Indeed, " '[e]vidence of a prior crime is always prejudicial to a defendant. It diverts the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character.' " *Id.* (quoting *United States v. James,* 555 F.2d 992, 1000 (D.C.Cir.1977)).

Tiran Casteel argues that the Court should sever or bifurcate Count Three because it requires proof that he previously committed a felony, whereas the other charges relating to carjacking and his alleged attempts to kill the elderly victim do not. Tiran Casteel's Br. in Supp. Mot. to Sever Counts at 2–3. According to Tiran Casteel, presentation of his prior felony conviction "will cause substantial prejudice to his right to a fair trial on the latter charges" because the evidence of his guilt on some of the other charges is weak. *Id.* Tiran Casteel asserts that the jury will focus on his felony, trying him on the basis of his character and not on the faulty merits of the case against him. *Id.*

■ The Government again failed to respond to this argument. After reviewing the hearing transcripts, the Court believes that a high risk of prejudice exists if Count Three were tried with the remaining Counts in the Indictment because Tiran Casteel's prior felony conviction for burglary would only be admissible as to Count Three. However, since the remaining evidence supporting Count Three is intertwined with the evidence supporting the other Counts in the Indictment, the Court will only order that trial on Count Three be bifurcated from the other Counts in the Indictment. Accordingly, the Court GRANTS in part and DENIES in part Tiran Casteel's Motion to Sever. The jury shall consider Tiran Casteel's guilt on Count Three after it considers his guilt on the other Counts in the Indictment.

Tiran Casteel also moves to have the Court sever Counts Eight and Nine. He argues that the evidence of his alleged attempts to kill Eitzen is "not particularly compelling" and will lead the jury to convict him on the remaining Counts based upon "a belief that the defendant is dangerous and violent," and not upon Defendant's "guilt or innocence." *Id.* at 3–4. The Court will deny this Motion, even without a response from the Government, because the evidence of Tiran Casteel's attempts to murder Eitzen will almost certainly be admissible against him on the remaining charges, thereby undercutting any risk of improper prejudice. *See Taken Alive,* 513 F.3d at 903. Accordingly, Tiran Casteel's motion to sever Counts Eight and Nine is DENIED.

### 3. *Motion for separate trials.*

■ An indictment may "charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b). The Court may, however, order separate trials for properly joined defendants when "consolidation for trial appears to prejudice a defendant." Fed.R.Crim.P. 14. The threshold for establishing prejudice is high, though, as "[t]here is a preference in the federal system for joint trials of defendants who are indicted together [because joint trials] promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Indeed, "[o]nce defendants are properly joined under Rule 8, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." *United States v. Flores,* 362 F.3d 1030, 1040 (8th Cir.2004). "To overcome the presumption, defendants must demonstrate severe or compelling prejudice." *United States v. Crumley,* 528 F.3d 1053, 1063 (8th Cir. 2008) (citing *Flores,* 362 F.3d at 1039). "Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a prejudicial spillover effect." *United States v. Hively,* 437 F.3d 752, 765 (8th Cir.2006) (internal citations and quotations omitted).

■ "The burden of showing a clear likelihood of prejudice falls on the party seeking severance." *Id.* (citing *United States v. Frazier,* 280 F.3d 835, 844 (8th Cir.2002)). "The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials." *United States v. Mason,* 982 F.2d 325, 328 (8th Cir.1993) (internal quotations and citations omitted). Likewise, "[s]everance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased." *Hively,* 437 F.3d at

765 (internal citations omitted). Instead, "[w]hat is required for a severance is a specific showing that a jury could not reasonably be expected to compartmentalize the evidence." *Id.* (citing *United States v. Lueth,* 807 F.2d 719, 731 (8th Cir.1986)). In a case where a defendant seeks a separate trial in order to call his codefendant as a witness, the defendant must demonstrate both that his co-defendant would likely testify and that the co-defendant's testimony would likely be exculpatory. *United States v. Mickelson,* 378 F.3d 810, 818 (8th Cir.2004) ("Nor is it enough for a defendant to claim … that he needed a separate trial in order to call a co-defendant as a witness. He must show that it is likely his co-defendant actually would have testified and that this testimony would have been exculpatory.") (citations omitted).

■ The Court may also order separate trials for two defendants when a joint trial would risk infringing the rights of one of the defendants. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933 ("We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."). In *Bruton v. United States,* "the Supreme Court held that the admission of statements from a non-testifying defendant that inculpated a co-defendant violated the latter's Confrontation Clause rights, despite a curative instruction otherwise." *Mickelson,* 378 F.3d at 819 (citing *Bruton,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). "However, when the statements are those of a co-conspirator and are admissible under Federal Rule of Evidence 801(d)(2)(E), the Sixth Amendment and *Bruton* are not implicated." *Id.* (citing *United States v. Alcantar,* 271 F.3d 731, 739 (8th Cir.2001)).

Devan Casteel requests that the Court order separate trial because: the jury in a joint trial will be unable to compartmentalize the evidence of Tiran Casteel's alleged attempts to murder the victim; a joint trial will prevent him from calling Tiran Casteel "to provide a rational explanation for the alleged captured communication"; and a joint trial would violate his confrontation rights under *Bruton.* Devan Casteel's Mem. in Supp. Mot. to Sever at 2–6. The Government resists, arguing that Devan Casteel has failed to meet his burden of proof because he has failed to show a "clear likelihood of prejudice" or indicated "the nature of any exculpatory evidence that might be produced" from Tiran Casteel. Pl.'s Resistance to Devan Casteel's Mot. to Sever ¶¶ 3–6. The Court agrees with the Government. Devan Casteel did not present any evidence relating to the contents or context of the alleged conspiratorial communications, which stymies the Court ability to gauge prejudice. Indeed, the Court cannot even conclude that Tiran Casteel's conspiratorial communications might exculpate Devan Casteel. Devan Casteel also offered no evidence that Tiran Casteel would testify, let alone provide exculpatory evidence. Defendant finally failed to identify any statements made by Tiran Casteel that would violate the *Bruton* rule. Accordingly, the Court will DENY Devan Casteel's Motion to Sever Trials because he failed to meet his heavy burden of proof. Should Devan Casteel wish the Court to reconsider its decision, he may file an appropriate motion with accompanying evidentiary support by August 3, 2009.

### C. Suppression

Both Defendants request that the Court suppress most of the evidence against them because the Government procured it in violation of their constitutional rights. Devan Casteel argues that the ATF's warrantless arrest of him violated his Fourth

Amendment rights because the Government did not have probable cause to believe he was committing a crime. Both Defendants assert that the subsequent warrantless search of the Bonneville violated their respective Fourth Amendment rights because the Government had no reasonable cause to believe further contraband would be found in the vehicle after locating the two firearms Tiran Casteel bought. Tiran Casteel also argues that the search warrant authorizing the search of his residence was invalid because it did not meet the Fourth Amendment's particularity or nexus requirements. Finally, Defendants challenge the two photographic lineups, stating that the lineups violated their Fifth Amendment due process rights because they were impermissibly suggestive and unreliable.

### 1. *Devan Casteel's arrest.*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV. A warrantless arrest is a reasonable seizure under the Fourth Amendment when it is supported by probable cause. *Beck v. State of Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "An officer has probable cause to make a warrantless arrest when circumstances would lead a reasonable person to believe a defendant has committed or is in the midst of committing an offense." *United States v. Dembry,* 535 F.3d 798, 800 (8th Cir.2008) (citing *United States v. Torres–Lona,* 491 F.3d 750, 755–56 (8th Cir.2007)). "Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *United States v. Mendoza,* 421 F.3d 663, 667 (8th Cir.2005) (internal citations omitted).

However, "[m]ere presence at the scene of a crime is not probable cause for a warrantless arrest." *United States v. Luschen,* 614 F.2d 1164, 1171 (8th Cir.1980) (internal citations and quotations omitted).

Devan Casteel argues that "there was no evidence whatsoever that indicates he was engaging in any criminal activity personally or that he was aiding and abetting in any capacity" when the ATF arrested him on September 12, 2008. Devan Casteel's Br. in Supp. of Mot. to Suppress and Mot. to Dismiss at 9. According to Devan Casteel, he was merely present when his father purchased two firearms from Agent White, and thus, any evidence obtained from his arrest must be suppressed because the officers did not have probable cause to conduct a warrantless arrest. *Id.* The Government generally denies this interpretation of the facts, and the Court concurs. Devan Casteel drove Tiran Casteel to the meeting, after which Devan Casteel watched the transaction until he took the firearms and placed them in his car. Even though Tiran Casteel never mentioned Devan Casteel to Agent White prior to the meeting, a reasonable officer could, nevertheless, conclude that Devan Casteel was aiding and abetting Tiran Casteel's unlawful attempts to possess a firearm. Devan Casteel appeared to be intentionally facilitating the transaction by driving, providing security with his presence, and physically transporting the weapons. Therefore, the Court finds that the ATF had probable cause to arrest Devan Casteel. Accordingly, the Court DENIES Devan Casteel's Motion and will not suppress any evidence based upon his arrest.

### 2. *The search of Devan Casteel's Bonneville.*

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon

probable cause is per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotations and citations omitted). One such exception is for searches of automobiles. *United States v. Blaylock,* 535 F.3d 922, 926 (8th Cir.2008) (stating that the warrant requirement does not apply to vehicles because vehicles can be moved quickly and because "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office") (internal quotations and citations omitted). Accordingly, the Government may search a vehicle without a warrant if the Government has probable cause to search the automobile and if the vehicle is readily mobile. *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten,* 230 F.3d 1083, 1085 (8th Cir.2000) (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

The Government may also conduct a warrantless search of a vehicle under some circumstances if the search is incident to a lawful arrest. Under the recently decided *Arizona v. Gant* case, the Supreme Court stated: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." —— U.S. ——, 129 S.Ct. 1710, 1723, 173 L.Ed.2d 485 (2009). This holding narrowed the scope of the previous rule, which provided that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

■■■ Defendants argue that the search of the Bonneville violated *Gant* because the search occurred after their arrest and because the Government did not have reason to continue the search after immediately locating the firearms in the backseat. Tiran Casteel's Br. in Supp. of Mot. to Suppress at 8; Devan Casteel's Suppl. Mot. to Suppress. The Government responds, arguing that: "Under these circumstances, police had not only the 'reasonable belief' required in *Gant* but [also] probable cause to search the vehicle." Pl.'s Supp. Resistance to Defs.' Mot. to Suppress ¶ 1. The Court concurs with the Government even though this is a close case. Agent Kessler testified that he searched the Bonneville for additional firearms, ammunition, and paperwork relating to weapon sales after he located the two firearms Tiran Casteel bought because, based upon his training and experience, "people who tend to be involved in [the] illegal sale and transfer of firearms, don't tend to do it just once." [10] Tr. at 174, 178.

---

10. Agent Kessler testified:

> THE WITNESS: No, Your Honor. The weapons were in the back seat, on the rear seat of the car.
> THE COURT: And you got those, didn't you?
> THE WITNESS: Yes, sir.

> THE COURT: So what else were you looking for beyond—once you got those, what else were you looking for?
> THE WITNESS: Additional firearms or ammunition that they may have brought with them, and any paperwork that might show that this is an ongoing deal, where they're purchasing or selling firearms.

However, Agent White testified that he did not believe any contraband existed in the vehicle beyond the two firearms based upon his conversations with Defendants.[11]

The Court finds that Agent White's testimony undercuts any reasonable belief that the Bonneville contained either additional firearms or ammunition because his conclusions were based upon personal interactions with Defendants, which the Court finds far more credible than generic training and experience. The Court, nevertheless, finds that Agent Kessler had probable cause to search the Bonneville, even after finding the two weapons Tiran Casteel bought, because a fair probability existed that paperwork evidencing this crime or other crimes would be found in the car. Tiran Casteel solicited the sale of firearms over the internet, and the Court finds that it would be reasonable to expect Tiran Casteel to print off some of his internet communications, including any communications used to arrange the meeting with Agent White, or even a map containing driving directions, and bring them to the meeting, which would be evidence of the crime. *Id.* at 178. Likewise, the Government could also reasonably believe that the receipt book used to produce the receipt for Agent White would be located in the Bonneville. *Id.* at 98, 167. Since this paperwork could have been hidden in either the bag or the box containing the coins, Agent Kessler had probable cause to search these items. Therefore,

the Court DENIES Defendants' motion to suppress the evidence stemming from the search of the Bonneville because the Court can find no constitutional defect.

### 3. *The search of Tiran Casteel's residence.*

 "The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). "'To satisfy the particularity requirement of the [F]ourth [A]mendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized.'" *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir.2007) (quoting *United States v. Horn*, 187 F.3d 781, 788 (8th Cir.1999)). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Horn*, 187 F.3d at 788. When written documents are to be searched and seized based upon their contents, the Fourth Amendment's particularity requirement must be applied with "scrupulous exactitude." *Stanford v. State of Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) ("In short, what this history indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the

THE COURT: Okay. They were in the back seat?
THE WITNESS: The two firearms that they purchased were on the back seat of the car about dead center.
THE COURT: And why would you think there was other paperwork?
THE WITNESS: Well, people who tend to be involved in [the] illegal sale and transfer of firearms, don't tend to do it just once.
Tr. at 174.

**11.** Agent White testified:

THE COURT: Do you know of any other illegal material, substance of any kind, that you were looking for in the, '88 (sic) Bonneville that was subsequently searched by Agent Kessler?
THE WITNESS: Not to my knowledge or that I was involved with, no.
THE COURT: There weren't bullets?
THE WITNESS: I had no reason to believe there was any bullets there. Tiran Casteel asked if I had any ammunition.
Tr. at 100.

most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain.") (citations omitted); *see also United States v. Stelten,* 867 F.2d 446, 450 (8th Cir.1989) ("When the government wishes to seize written material for any reason other than the content of the material, the first amendment is not infringed and the scrupulous exactitude test does not apply."). Should only a portion of a warrant fail the particularity requirement, then that portion of the warrant is invalid and the evidentiary fruit stemming from that portion must be suppressed. *United States v. Timley,* 443 F.3d 615, 622 (8th Cir.2006) ("A warrant that fails in this particularity requirement is invalid, and evidence seized for no reason other than reliance on invalid portions of a warrant must be suppressed. However, where the warrant is invalid only in part, the warrant is 'severable,' and items seized pursuant to valid portions of the warrant need not be suppressed.") (citations omitted).

 Tiran Casteel primarily argues that the search warrant for his residence was invalid because it failed to satisfy the particularity requirement. Tiran Casteel's Br. in Supp. of Mot. to Suppress at 11. According to Tiran Casteel, the search warrant implicated the First Amendment because it authorized the search and seizure of documents, thereby triggering the "scrupulous exactitude" standard. *Id.* Tiran Casteel asserts that the warrant failed to meet this heightened standard, or even the standard particularity requirement, because the "broad language of the warrant appears to authorize exactly the type of rummaging in a defendant's personal effects which the Fourth Amendment was intended to prohibit." *Id.* The Court does not find this argument persuasive in spite of the Government's failure to respond.

Attachment A to the Tiran Casteel Search Warrant contains three paragraphs delineating the permissible scope of the search. The first paragraph provides for searching and seizing: "Records, documents, video recording, and photographs related to the acquisition and possession of firearms...." Ex. E. This language does not trip the heightened particularity requirement because the writings are being sought on a reason unrelated to "the ideas which they contain." *Stanford,* 379 U.S. at 485, 85 S.Ct. 506. The Government only sought those writings in order to link Tiran Casteel with the possession and sale of firearms, a purpose unrelated to the ideas or contents of the writing. The Government was not seeking documents simply because they contained ideas or information about weapons. *See Stelten,* 867 F.2d at 450 (distinguishing the seizure of business records with the seizures of books based upon their ideas). The Court further believes that while the first paragraph contains broad language, it nevertheless satisfies the particularity requirement because evidence of weapons possession and sales can take many forms, including photographs, ledgers, or even shipping receipts. Accordingly, the Court finds that suppression is not warranted in this case because even if the two remaining paragraphs in Attachment A were invalid, those paragraphs are severable and the evidence at issue was found during a search that fell within the scope of the first paragraph's authorization. *See Timley,* 443 F.3d at 615. Indeed, the Government could not discern if the paper containing the map to Eitzen's residence was evidence of weapons possession or sale until the agent observed it, at which point the entire contents of the rudimentary map was immediately apparent. Ex. 4.

In the alternative, Tiran Casteel briefly argues that the ATF warrant was invalid because it "failed to establish a nexus between the crime and the Defendant's residence." Tiran Casteel Br. in Supp. of

Mot. to Suppress at 12. According to Tiran Casteel, there was "nothing in the affidavit to indicate that the defendant was ever observed with firearms at that residence or that he had told anyone that he kept firearms at that residence." *Id.* at 13. Tiran Casteel also argues that the phone number from the Craigslist posting was traced to his cell phone, not his residence, thereby undercutting any link between the crime and his residence because cell phones are mobile. *Id.* at 12–13. The Government again failed to respond to this argument, but the Court finds the claim without merit.

▮▮▮ The Fourth Amendment requires "evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez,* 217 F.3d 547, 550 (8th Cir.2000) (citing *United States v. Koelling,* 992 F.2d 817, 823 (8th Cir.1993)). The Court generally cannot look beyond the affidavit supporting the warrant to find evidence of this nexus. *United States v. Gladney,* 48 F.3d 309, 312 (8th Cir.1995) ("When the magistrate relied solely on the affidavit presented to him, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.") (internal citations and quotations omitted). Here, the Affidavit states that Tiran Casteel solicited firearms over the internet, that he communicated with Agent White via email, and that Tiran Casteel's home was the residence to be searched. Ex. E. These statements establish the requisite nexus because computers and property, including contraband, are often located in their owners' home. Therefore, the Court finds that probable cause existed to search Tiran Casteel's residence because the affidavit sets forth facts making it objectively reasonable to conclude that evidence of illicit firearms transactions could be found in his home. Accordingly, the Court DENIES Tiran Casteel's Motion to Suppress the evidence found in his home.

### 4. *The two photographic lineups.*

"A crime victim's identification of the defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive *and* unreliable." *United States v. Jones,* 535 F.3d 886, 891 (8th Cir.2008) (internal quotation omitted). "An identification is unreliable if its circumstances create a very substantial likelihood of irreparable misidentification." *United States v. Martinez* 462 F.3d 903, 910 (8th Cir.2006) (internal quotation omitted). To make reliability determinations, the Court uses a totality of the circumstances test that focuses on " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.' " *United States v. Williams,* 340 F.3d 563, 567 (8th Cir.2003) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Single photograph displays are inherently suggestive, and "must be weighed against these factors" as well. *United States v. Patterson,* 20 F.3d 801, 806 (8th Cir.1994) (citing *Manson,* 432 U.S. at 114, 97 S.Ct. 2243). However, "[p]olice officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." *Martinez,* 462 F.3d at 910 (internal quotation omitted).

Defendants argue that both photographic lineups violated their due process rights because they were impermissibly sugges-

tive and unreliable. Tiran Casteel argues that the September 12, 2008 photographic lineup was impermissibly suggestive because it was the "functional equivalent of a one-photo lineup." Tiran Casteel's Br. in Supp. of Mot. to Suppress Identification Testimony at 5. He further argues that the identification was unreliable given Eitzen's age and because of her general inability to provide a detailed description of either of the robbers or even of their weapons prior to the lineup. *Id.* at 7–9. Devan Casteel makes similar arguments, claiming the lineup procedure was "highly suspect and extremely suggestive in nature" and that Eitzen could not have picked him out without being led by law enforcement. Devan Casteel's Br. in Supp. of Mot. to Suppress and Mot. to Dismiss at 8. Both Defendants also argue that the first improper lineup contaminated the second lineup. The Government responds by generally arguing that the lineups procedures were proper and that Eitzen's identifications were reliable primarily due to the lengthy period of time she observed them during the robbery. Pl.'s Resistance to Devan Casteel's Mot. to Suppress and Mot. to Dismiss ¶¶ 4, 7.

■ The Court agrees with Defendants. Agent Shreffler conducted a three person photographic lineup that included only suspects on September 12, 2008. Tr. at 321 (Deputy Sheriff Charles McCalla testifying that Agent Shreffler requested photographs of Defendants and all known associates). This type of photographic lineup procedure is atypical and more suggestive than the standard six panel photographic arrays that contain five known innocents and one suspect. *Id.* at 415–16.

Agent Shreffler's photographic lineup was also much more suggestive than the standard photographic lineups because Defendants and Blank possess significantly different physical appearances. *Id.* at 414; Exs. A1–A3. Additionally, Professor Otto MacLin ("MacLin"), Ph.D., an expert in eyewitness identifications, testified that the September 12, 2008 photographic lineup was suggestive after viewing all the evidence and testimony in the suppression hearing.[12] Tr. at 426. The Court concurs with MacLin's testimony and will further find that the photographic lineup was impermissibly suggestive because no exigency existed to justify this highly unorthodox lineup procedure. As discussed below, Agent Shreffler testified that the urgency he felt to conduct the lineup was based on his concern with Eitzen's memory fading due to her stress and fatigue, but the Court cannot discern how waiting until Eitzen rested would have harmed her ability to make an identification. Indeed, the Government failed to show how waiting a few more hours while Eitzen rested and regained her composure would have made any difference, given that the robbery had already occurred over a half a day earlier. The Government implicitly concedes this point as it conducted a second photographic lineup weeks later after realizing the potential problems associated with the first lineup. *Id.* at 382–83, 394–95.

The Court also finds that the September 12, 2008 photographic identification created a very substantial likelihood of irreparable misidentification. The Court acknowledges that Eitzen observed both Defendants for a significant period of time during the robbery and that Eitzen posi-

---

**12.** The Government objected to MacLin's testimony on the ground that the reliability of photographic identifications is a jury question. However, the Court acts as a gatekeeper, excluding impermissibly suggestive and unreliable identifications, because admittance of those types of identifications offend the Constitution. *See generally Jones,* 535 F.3d at 891. The Court, thus, finds MacLin's testimony on suggestiveness and reliability relevant and admissible because it goes to the matter now before the Court.

tively identified Defendants less than 24 hours after the robbery with a high level of certainty, which heavily favors the inference that her identification was reliable. However, Eitzen's prior description of both intruders was extremely vague.[13] *Id.* at 219, 223–27, 380. Eitzen also identified the masked intruder as Devan Casteel only by his "nice looking eyes," which she believed were blue, but the photograph Agent Shreffler provided to Eitzen discolored and partially obscured Devan Casteel's eyes. *Id.* at 13, 62; Ex. A–1. Further, Eitzen's cognitive ability and memory during the first lineup also appears to have been diminished to the point that her daughter was prompting her occasionally during the interview. Tr. at 192–93. While the Court finds her condition more than understandable given her age, ordeal, and lack of sleep, the Court has grave concerns about the reliability of her identification, especially in light of her noticeable memory difficulties at the evidentiary hearing. Finally, MacLin testified that in his expert opinion, the September 12, 2008 photographic lineup was unreliable.[14] *Id.* at 426–27. Based upon

this evidence, and in light of the highly suggestive nature of the lineup, the Court finds that Eitzen's September 12, 2008 identification of Defendants was unreliable and must be suppressed.

The Court will likewise suppress the later October 9, 2009 photographic lineup even though the Government presented Eitzen with two photographic panels containing only one suspect and five new known innocents. First, the Court believes that the October lineup was impermissibly suggestive because it employed the same photographs Agent Shreffler used in September, despite the Government's ability to procure or manufacture new photographs of the incarcerated Defendants. *Id.* at 236, 383–85. Second, the Court believes the October lineup was even more unreliable than the September photographic lineup because Eitzen saw the same photographs of Defendants and because Eitzen read a newspaper article with photographs, which identified Defendants as suspects in her robbery. *Id.* at 46, 236. Additionally, MacLin testified that subsequent identifi-

---

13. Officer Daly testified:

> Q. And do you recall how [Eitzen] described [the intruders]?
> A. She stated that there was one that was not wearing a mask that was between 40 and 50 years old, she was guessing, and a second one that she said was described as in his twenties and he was wearing a mask.
> Q. Did she describe, other than their age, their physical shape and size?
> A. First one she said was a larger man; the one in his twenties, not as large.
> Q. Okay. Did she define what she meant by large?
> A. Not in great detail. Just a bigger-built man.
>
> Tr. at 219.

14. MacLin testified:

> Q. Do you believe, based upon your scientific knowledge and the testimony that you've heard while attending this case, that

the identification procedures employed here were unnecessarily suggestive and conducive to a likelihood of irreparable misidentification?
> A. Oh, absolutely. And I'd also add that, you know, they were speaking, "Well, we had this, like, window of opportunity because this person's memory was fading," so they rushed to do less than desirable procedures. And, you know, again, that's problematic as well because we did get a feel for how much her memory had faded at that time because she doesn't even remember the details at that point. Who's to say, but they probably should have waited and done it right the first time. And so what you end up with is that the identification is so unreliable, you don't know if she would have identified those guys under proper circumstances or not. So we really don't—we really can't be confident what her state of memory was for these individuals.
>
> Tr. at 426.

cations tend to erroneously increase the confidence of individuals in their identifications, which is extremely problematic in this case given that the first lineup was tainted. *Id.* at 420. Therefore, the Court will find that the second photographic lineup must be suppressed for being impermissibly suggestive and unreliable, even without considering whether the first improper lineup would preclude the Government from presenting this evidence. Accordingly, Defendants motions to suppress the identifications are GRANTED.

### D. *Motion in Limine*

The Court believes it prudent to reserve ruling on Devan Casteel's pending Motion in Limine despite the Government's lengthy response. The Court will hear further arguments on the matter on the morning of trial.

### III. CONCLUSION

After careful consideration, the Court GRANTS Defendants' Motion to Dismiss Counts Six and Seven (Clerk's Nos. 85, 140). The Court also GRANTS in part and DENIES in part Defendants' Motions for severance (Clerk's Nos. 89, 141, 146). The Court likewise GRANTS in part and DENIES in part Defendants' Motions for suppression (Clerk's Nos. 85, 123, 139, 142). Finally, the Court RESERVES RULING on Devan Casteel's Motion in Limine (Clerk's No. 124).

IT IS SO ORDERED.